1

2  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF NEW YORK

3  -----------------------------------------X
   CARINA BOUTSIKAKIS, in her individual

4  capacity and on behalf of others similarly
   situated,

5

                            PLAINTIFFS,
6

7          -against-          Case No.:

8                             1:15-cv-05833-EK-RML

9

   TRI-BOROUGH HOME CARE, LTD.,

10

                            DEFENDANT.
11 -----------------------------------------X

12                 DATE: June 15, 2020

13                 TIME: 10:23 A.M

14

15

16          DEPOSITION of the Plaintiff,

17 CARINA BOUTSIKAKIS, taken by the Defendant,

18 pursuant to Stipulation and to the Federal

19 Rules of Civil Procedure, held at the

20 offices of Veritext Legal Solutions, 330

21 Old Country Road, Mineola, New York 11501,

22 before Lisa O'Leary, a Notary Public of the

23 State of New York.

24

25

1
2    A P P E A R A N C E S:
3
4    ANDERSON DODSON, P.C.
         Attorneys for the Plaintiffs
5        11 Broadway - Suite 615
         New York, New York 10004
6        BY: CHRISTOPHER T. ANDERSON, ESQ.
7
8    DAVID S. FRIEDBERG, ESQ.
         Attorneys for the Defendant
9        521 5th Avenue - 17th floor
         New York, New York 10175
10       BY: DAVID S. FRIEDBERG, ESQ.
11
12
13
     ALSO PRESENT:
14
         ANDERSON DODSON, P.C.
15       Attorneys for the Plaintiffs
         11 Broadway - Suite 615
16       New York, New York 10004
         BY: PENN DODSON, ESQ.
17
18
         JACQUE RICHARDS
19       CHANTALE MICHEL
20
21              *         *         *
22
23
24
25

1

2   F E D E R A L   S T I P U L A T I O N S

3

4

5      IT IS HEREBY STIPULATED AND AGREED by and

6   between the counsel for the respective

7   parties herein that the sealing, filing and

8   certification of the within deposition be

9   waived; that the original of the deposition

10   may be signed and sworn to by the witness

11   before anyone authorized to administer an

12   oath, with the same effect as if signed

13   before a Judge of the Court; that an

14   unsigned copy of the deposition may be used

15   with the same force and effect as if signed

16   by the witness, 30 days after service of

17   the original & 1 copy of same upon counsel

18   for the witness.

19

20      IT IS FURTHER STIPULATED AND AGREED that

21   all objections except as to form, are

22   reserved to the time of trial.

23

24            *     *     *     *

25

1                    C. BOUTSIKAKIS

2    C A R I N A        B O U T S I K A K I S,

3    called as a witness, having been first duly

4    sworn by a Notary Public of the State of

5    New York, was examined and testified as

6    follows:

7    EXAMINATION BY

8    MR. FRIEDBERG:

9         Q.    Please state your name for the

10   record.

11        A.    Carina Boutsikakis.

12        Q.    What is your current home

13   address?

14        A.    275 Sheldon Avenue,

15   Staten Island, New York 10312.

16        Q.    Ms. Boutsikakis, you're one of

17   the plaintiffs in this action?

18        A.    Yes, sir.

19             MR. FRIEDBERG:  I will ask that

20        a certain writing be marked for

21        identification.  It's called an

22        application for employment.

23             That will be Defendant's A.

24             (Whereupon, the aforementioned

25        document was marked as Defendant(s)'

1          C. BOUTSIKAKIS

2          Exhibit A for identification as of

3           this date.)

4      Q.    Are you a registered nurse?

5      A.    Yes.

6      Q.    And when did you become a

7   registered nurse?

8      A.    Approximately six years ago,

9   six to seven years ago.

10      Q.    Do you know the exact date, at

11   this point?

12      A.    I do not.  I'm sorry.

13      Q.    And how did you acquire that

14   status, as a registered nurse?

15      A.    I went to Saint Paul's School

16   of Nursing in Staten Island.  I acquired my

17   associates degree.

18            I then took my NCLEX, my state

19   board exam.  I passed and then I went onto

20   Chamberlain University, to acquire my

21   Bachelor's degree.

22      Q.    Do you know when you first

23   contacted the defendant, Tri-Borough Home

24   Care, Inc.?

25      A.    I do not recall the date.

1              C. BOUTSIKAKIS

2        Q.    And was there a particular

3   division of Tri-Borough Home Care, Limited,

4   that you came into contact with?

5        A.    Can you repeat the question,

6   please?

7        Q.    Was there a particular division

8   of Tri-Borough Home Care, Limited, that you

9   came into contact with?

10       A.    I do not recall.

11       Q.    Does Family Pediatric Home Care

12  refresh your recollection?

13       A.    Yes.

14       Q.    And do you recall when that

15  occurred?

16       A.    No, I do not.

17       Q.    If I show you a writing

18  application for employment and ask you to

19  look at the first page, please.

20       A.    Yes, sir.  That is my writing.

21       Q.    You see the date?

22       A.    Yes.

23       Q.    The date is what?

24       A.    That would be June 8th, 2015.

25       Q.    Does that refresh your

```
 1              C. BOUTSIKAKIS
 2   recollection, when you first visited with
 3   Family Pediatric Home Care?
 4        A.    Yes, sir.
 5        Q.    And how did it come about, that
 6   you came to that entity, Family Pediatric
 7   Home Care?
 8        A.    I was a new nurse, straight out
 9   of Saint Paul's School of Nursing.
10              I had applied to several
11   facilities.  I had applied to temp
12   agencies, as well as Tri-Borough, and
13   Tri-Borough Home Care had contacted me back
14   and asked me to come in and that's how I
15   was hired.
16        Q.    Do you know who at Tri-Borough
17   Home Care, had contacted you?
18        A.    I do not recall the exact
19   person who contacted me.
20              I recall that I was contacted
21   by someone and I came in for an interview
22   and I was hired the same day.
23        Q.    Was it a male or a female who
24   first contacted you, on behalf of Family
25   Pediatrics Home Care?
```

1              C. BOUTSIKAKIS

2      A.    I believe a female.

3      Q.    Now, is it correct you were

4  interviewed on June 8th, 2015?

5      A.    Yes.

6      Q.    And where did that interview

7  take place?

8      A.    At the main office of

9  Tri-Borough.

10     Q.    Which was where?

11     A.    In Queens.

12     Q.    Queens.  Where in Queens?

13     A.    I do not recall the exact

14  location.

15     Q.    And in the course of your

16  meeting with a representative of -- was it

17  Family Care, Family Pediatric Home Care

18  that you met with or was it Tri-Borough

19  Home Care, Limited, as a general statement?

20     A.    I came in as general.

21           I did not -- I applied for any

22  position as a RN and I was put into Family

23  Pediatrics.

24           I knew that there was a broad

25  spectrum of clients and I had fallen into

```
 1              C. BOUTSIKAKIS
 2  the category of Family Pediatric Home Care.
 3       Q.    Was that at the first meeting
 4  that you had, with Tri-Borough Home Care?
 5       A.    Yes, sir.
 6       Q.    And did you provide also a
 7  background of your experience, prior to
 8  meeting with the representative of
 9  Tri-Borough Home Care?
10       A.    Yes, sir.
11       Q.    And I ask you to look at page 3
12  of this writing, Defendant's Exhibit A
13  and --
14            MR. ANDERSON:  Can you tell us
15         the Bates number?
16            MR. FRIEDBERG:  Yes.  It's page
17         3, page 3 of 69.
18       Q.    We are referring to document
19  request number eight, and that's been
20  marked as Exhibit A.
21            MR. ANDERSON:  Thank you.
22       Q.    Would you kindly look at that
23  page.
24            Is that your handwriting?
25       A.    Yes, sir.
```

1           C. BOUTSIKAKIS

2      Q.    Were you given a form to fill

3  out, at your interview?

4      A.    Yes, sir.

5      Q.    And this is a form that was

6  completed by you?

7      A.    Yes, sir.

8      Q.    Now, when did you graduate from

9  Saint Paul's School of Nursing?

10      A.    I do not remember the

11  approximate date.

12      Q.    So if you look at page 2 of

13  Exhibit A, does that refresh your

14  recollection?

15      A.    This does not tell me the date.

16  It only tells me my educational history.

17      Q.    And is that a form that you had

18  filled out?

19      A.    Yes, sir.

20      Q.    That's your handwriting?

21      A.    Yes, sir.

22      Q.    Now, do you know when you

23  graduated from Saint Paul's School of

24  Nursing?

25      A.    I would have to check my

1                    C. BOUTSIKAKIS
2    documentation.
3         Q.    Now, I show you page 5 of the
4    exhibit.
5              Does the information on that
6    page refresh your recollection, as to when
7    you graduated from Saint Paul's School of
8    Nursing?
9         A.    Yes, sir.
10        Q.    And what date is that?
11        A.    December 2012.
12        Q.    And when you appeared for your
13   interview at Tri-Borough Home Care, had you
14   at that time been also a student at
15   Chamberlain College of Nursing?
16        A.    Yes, sir.
17        Q.    And was that a school, where
18   you were physically studying?
19             MR. ANDERSON:  Object to form.
20             Go ahead.
21        A.    I don't understand the
22   question.
23        Q.    Were you also a student, at
24   that college?
25        A.    Yes.

1                    C. BOUTSIKAKIS
2        Q.    And where was that college
3    located?
4        A.    Online education program.
5        Q.    Pardon?
6        A.    Online education program.
7        Q.    Online.
8              Was Saint Paul's School of
9    Nursing also online?
10       A.    No.
11       Q.    Now, had you graduated from
12   that Chamberlain College of Nursing, at the
13   time that you were initially interviewed
14   for a position at Tri-Borough Home Care,
15   Limited?
16       A.    To my recollection I believe I
17   was in the process of graduating from
18   Chamberlain.
19       Q.    When did you graduate?
20       A.    I do not recall the date.  I
21   would have to check my notes.
22       Q.    If we look at page 5 of Exhibit
23   A, you see information that would refresh
24   your recollection?
25       A.    Expected graduation May 2016.

                    C. BOUTSIKAKIS

1

2    Q.    Now, in what way would

3  Chamberlain School of Nursing have enhanced

4  your status as a registered nurse?

5    A.    I was bridging from an

6  associates degree, to a Bachelor's degree.

7    Q.    And what would that have

8  entailed, in the course of your studying?

9            MR. ANDERSON:  Object to form.

10           Go ahead.  Answer, if you know.

11   A.    A more rigorous form of

12  nursing.

13           I would get more opportunities

14  with a Bachelor's degree.

15           I'm not really sure what

16  else --

17   Q.    Would you have supplemented any

18  portion of your education, that you

19  acquired at Saint Paul's School of Nursing?

20   A.    It just furthered my degree.

21   Q.    And in what respect?

22   A.    A Bachelor's degree in nursing

23  is just a further -- to further my nursing

24  degree.

25           I'm not understanding your

                    C. BOUTSIKAKIS

1   question exactly.  I'm sorry.  I apologize.

2         Q.    Don't apologize.

3               What additional education would

4   you have acquired studying online, at

5   Chamberlain College of Nursing?

6               MR. ANDERSON:  Object to form.

7               Go ahead.  Answer.

8         A.    It was more in depth of nursing

9   practice, procedure and protocol and my

10  interest was to learn more of not only

11  science, but also personally.

12              I wanted to further my degree.

13  I needed to know every aspect of nursing,

14  not just the basics, that were standard for

15  the state.

16        Q.    And how were the courses

17  conducted online, to your recollection?

18        A.    To my --

19        Q.    At Chamberlain College of

20  Nursing.

21        A.    To my recollection the courses

22  I took online were over the course of

23  several weeks, online forums, homework

24  every week, discussions with the classroom

1                    C. BOUTSIKAKIS

2   online and discussions with the professor

3   that was teaching.

4       Q.    How many hours a week, if you

5   recall, would you have been studying at

6   Chamberlain College of Nursing?

7       A.    I cannot approximate that at

8   this time, I cannot.

9       Q.    Now, you had graduated from

10  Saint Paul's School of Nursing in December

11  2012 and if we look at page five of the

12  document we identified --

13      A.    Yes, sir.

14      Q.    -- does that accurately

15  describe what you did between your

16  graduation as a nurse and your interview

17  with Tri-Borough Home Care?

18              MR. ANDERSON:  Object to form.

19      A.    Yes, sir.

20      Q.    Now, you understand that you

21  graduated in December 2012 and you were

22  working as an office manager for Godfrey

23  Propeller Adjusting Corporation from

24  September 2004, to the present.

25              That was the date that you

1                    C. BOUTSIKAKIS

2    appeared for your interview?

3         A.    Yes, sir.

4         Q.    Now, how many hours a day did

5    you spend at that entity?

6         A.    Prior to -- which dates are you

7    referring to?  Because I have worked there

8    for quite some time.

9         Q.    From the date that you

10   interviewed with Tri-Borough Home Care.

11               MR. ANDERSON:  Object to form.

12        A.    Full time.

13        Q.    Full time.

14               Was Saint Paul's School of

15   Nursing, a night school?

16        A.    They had both day and night

17   sessions.  I participated in both day and

18   night sessions.

19        Q.    And at the same time you were

20   managing day to day operations for Godfrey

21   Propeller Adjusting Corporation?

22        A.    Yes, sir.

23        Q.    Now, that was from September

24   2004, to the date that you interviewed, was

25   June 8th, 2015?

1                    C. BOUTSIKAKIS

2          A.    Yes, sir.

3          Q.    And what did you do there?

4          A.    I balanced the general ledger.

5     I performed general bookkeeping.

6                I participated in expanding the

7     corporation, managing day-to-day

8     operations, which included -- it was

9     Godfrey Propeller Adjusting Corporation, so

10    I coordinated ships coming in, propellers

11    coming off and propellers coming to my

12    shop.  I managed.

13         Q.    Propellers?  These are maritime

14    propellers?

15         A.    Yes, sir.

16         Q.    And is it fair to say, that was

17    a full time job?

18         A.    Yes, sir.

19         Q.    Also you list that you worked

20    for Anthem, Incorporated?

21         A.    Yes, sir.

22         Q.    And that was from March 2015,

23    to May?

24         A.    Yes, sir.

25         Q.    What was Anthem?  What was the

1                    C. BOUTSIKAKIS

2    nature of Anthem's business?

3         A.    Anthem is a Blue Cross/Blue

4    Shield entity.

5              Anthem is owned by Blue Cross/

6    Blue Shield and under Anthem I was a HEDIS

7    registered nurse.

8         Q.    And what is that?  What is a

9    HEDIS  registered nurse?

10        A.    I -- to explain it, I collected

11   data, evaluated and audited medical charts.

12        Q.    Collected data, from medical

13   charts?

14        A.    From office -- doctors, I

15   collected medical charts.

16              I reviewed them and audited for

17   Blue Cross/Blue Shield, which was also a

18   Medicare/Medicaid corporation.

19        Q.    When you say audited, what

20   types of work did that entail?

21        A.    Medical chart review.

22              There are certain measures that

23   need -- that states what doctors need to --

24   doctors need to follow guidelines, for

25   state and federal regulations.

1                    C. BOUTSIKAKIS

2                    HEDIS nurses collect data,

3    audit and make sure that doctors are

4    complying.

5         Q.    At the same time you were still

6    managing day-to-day operations, for Godfrey

7    Propeller Adjusting Corporation?

8         A.    Yes, sir.

9         Q.    How did you manage both, to be

10   at both companies?

11               MR. ANDERSON:  Object to form.

12        A.    I managed both.  I performed

13   well, doing both.  I maintained both very

14   well and I did well in my occupations.

15               I'm not sure what the question

16   entails, other than -- what are we actually

17   asking here?

18        Q.    Did you have an office, with

19   Anthem, Incorporated?

20        A.    Anthem was at 60 Wall Street.

21        Q.    And Godfrey Propeller Adjusting

22   Corporation was located where?

23        A.    40 Van Street.

24        Q.    40 --

25        A.    40 Van Street, Staten Island,

1              C. BOUTSIKAKIS

2    New York.

3         Q.    Given a day, any day, how did

4    you manage the daily operations of Godfrey

5    Propeller Adjusting Corporation in Staten

6    Island and still be at the office of

7    Anthem, Incorporated?

8              MR. ANDERSON:  Object to form.

9         A.    My hours for Godfrey Propeller

10   were 24 hours.

11             My hours for Anthem, were set

12   hours.

13             I was to collect data or I was

14   to audit charts and I would manage each day

15   according to Anthem and I would work around

16   with Godfrey Propeller.

17        Q.    If I ask you to look at page

18   five further and look at Tallen Technology

19   Rentals.

20        A.    Yes, sir.  Yes, sir.

21        Q.    And it says you were logistics

22   coordinator?

23        A.    Yes.

24        Q.    Now, you list Tallen Technology

25   Rentals as Iselin, New Jersey.

1                    C. BOUTSIKAKIS

2        A.      Yes, sir.

3        Q.      Were you there?

4        A.      Yes, sir.

5        Q.      And that was 2014, January, to

6   June 2014?

7        A.      Yes, sir.

8        Q.      And at the same time you were

9   employed by Godfrey Propeller Adjusting

10  Corporation?

11       A.      I would have to check my

12  records.

13       Q.      Isn't that what your statement

14  provides?

15       A.      Yes, yes.

16       Q.      Where is Iselin, New Jersey

17  geographically or is it Iselin?

18       A.      It's located central New

19  Jersey.

20       Q.      And what was the nature, of

21  that entity?

22               What type of business did that

23  entity perform?

24       A.      Third party booking.  We were

25  the middleman between a corporation wanting

```
 1              C. BOUTSIKAKIS
 2  an event to happen and equipment we
 3  acquired for the corporation to hold the
 4  event.
 5              We provided those -- that
 6  equipment.
 7       Q.    If we look at your activities,
 8  as you list them, since graduating from the
 9  nursing school, Saint Paul's School of
10  Nursing, what nursing activities did you
11  perform?
12       A.    Anthem, Incorporated.
13       Q.    Pardon?
14       A.    Anthem, that is a reg -- you
15  have to be a registered nurse, in order to
16  be a HEDIS registered nurse.
17       Q.    That was review of records,
18  wasn't it?
19              MR. ANDERSON:  Object to form.
20       A.    You are only allowed to review
21  records, if you are a registered nurse.
22  That is a HIPAA violation, if you are not.
23       Q.    And that was, that was the
24  nature of your activities; is that correct?
25       A.    Yes, sir.
```

1             C. BOUTSIKAKIS

2        Q.    There was no contact with a

3   particular patient at that time, was there?

4        A.    Doctor McCormick & Associates

5   in Linden, New Jersey from March 2012 to

6   2000 -- June 2012, which I state in my

7   resume, I dealt with patients, only

8   patients.

9        Q.    With Doctor McCormick in

10  Linden, New Jersey, you were present from

11  March 2012 to June 2012?

12       A.    Hmm-hmm.

13       Q.    And you graduated from Saint

14  Paul's School of Nursing, in December 2012?

15       A.    Yes, sir.

16       Q.    Subsequent to December 2012,

17  did you perform any nursing activities,

18  dealing with patients themselves?

19       A.    At Doctor McCormick &

20  Associates, as it states in my resume, I

21  assisted in patient care.

22       Q.    Well, that was while you were

23  still a student at Saint Paul's School of

24  Nursing, am I correct?

25       A.    Yes, sir.

1          C. BOUTSIKAKIS

2          Q.    So the question was after you

3    graduated from Saint Paul's School of

4    Nursing, did you perform any nursing

5    activities, dealing with actual patients?

6          A.    I would have to look at my

7    records, based upon my volunteering, not

8    just my paid professional experence, as

9    you can see at the bottom.

10         Q.    What years did you perform

11   nursing experience, listed at the bottom of

12   that page?

13         A.    I do not recall the exact dates

14   of Mr. Justin LaGrece's (phonetic)

15   Foundation For Camp Hope in Life.  I was a

16   registered nurse at the time and I did

17   assist in registered nurse -- as a nurse I

18   helped in Camp Hope in Life, at their

19   facility.

20         Q.    What activities did that entity

21   perform?

22         A.    A camp nursing counselor.

23             MR. ANDERSON:  Objection to

24        form.

25         Q.    What activities did that entity

```
1                    C. BOUTSIKAKIS
2   you described perform?
3        A.    Camp nursing counselor.
4        Q.    Camp nursing counselor?
5        A.    Yes, sir.
6        Q.    And what was the name, of that
7   entity?
8        A.    This is Camp Hope in Life, for
9   use with HIV or family members affected
10  with HIV.
11       Q.    And where was that camp
12  located?
13       A.    The facility itself is in
14  Staten Island.  The camp was in New Jersey.
15       Q.    And where did you perform
16  services for Camp Hope in Life?
17       A.    The exact location I do not
18  recall.
19             I would have to look at my
20  notation, for the exact location.
21       Q.    What was the nature of Camp
22  Hope in Life's activities?
23       A.    Nursing and counseling.
24       Q.    For whom?
25       A.    For the youths that attended
```

1              C. BOUTSIKAKIS
2      Camp Hope in Life.
3          Q.    And what were the age groups,
4      of those youths?
5          A.    Teens.
6          Q.    Teens?
7          A.    Teenagers.
8          Q.    What was the reason, that they
9      would enroll in Camp Hope in Life?
10              MR. ANDERSON:  Object to form.
11          Q.    The purposes of Camp Hope in
12      Life?
13          A.    Camp Hope in Life is an
14      organization that provides stability and
15      nurturing, of youths who are affected by
16      HIV or AIDS, and as the organization we
17      provided them with counseling services and
18      a way to de-stress I'd say.
19          Q.    Were these youths affected with
20      HIV AIDS?
21          A.    Some were, yes.
22          Q.    And were your activities
23      counseling, of those youths?
24          A.    Yes, sir.
25          Q.    Did you provide any medical

1                    C. BOUTSIKAKIS
2    care, as a nurse?
3         A.    Yes, sir.
4         Q.    What, to your recollection?
5         A.    To my recollection it was the
6    camp, so we were in the woods.
7              There were ticks.  Some of them
8    needed to be treated.  I removed the tick,
9    placed it in the specimen cup and sent it
10   out.
11             Other than that, I assisted the
12   youths with their daily medications and of
13   regular nursing or counseling services.
14        Q.    And what period of time are we
15   discussing, when you speak of Camp Hope in
16   Life?
17        A.    During the time of my
18   associates degree, from my associates
19   degree to my certification.
20        Q.    So is it after you graduated
21   from Saint Paul's School of Nursing or
22   during -- as a student of Saint Paul's
23   School of Nursing?
24        A.    I would have to check my
25   records, sir.  I do not recall the exact

```
 1              C. BOUTSIKAKIS
 2    dates.
 3              I'm sorry.
 4         Q.    It's okay.
 5              When you were first interviewed
 6    at Tri-Borough Home Care, Limited, were you
 7    then referred to its division Family
 8    Pediatrics Home Care, at the time that you
 9    were interviewed?
10         A.    At the time I was interviewed,
11    I was coming into Tri-Borough, unaware
12    there was a family division, and I was
13    introduced the same day to that division
14    and hired on the spot same day.
15         Q.    How did that come about, as you
16    recall?
17         A.    As I recall I came in with my
18    resume, my certification, my Saint Paul's
19    School of Nursing Degree, a copy of my
20    degree and I sat down for an interview and
21    they hired me.
22         Q.    When you say they hired you,
23    did the interviewer explain to you the
24    activities of Family Pediatric Home Care?
25              MR. ANDERSON:  Object to form.
```

1           C. BOUTSIKAKIS

2      A.    I have trouble answering this

3  question, only because this was a very

4  confusing interview and introduction into

5  family pediatrics.

6           I was both hired and trained,

7  on the same day that I interviewed.

8           As I said, I did not know that

9  I was being hired into the family division,

10  but I was hired and I was interviewed,

11  hired and educated all within a very short

12  span of time.

13      Q.    The same day?

14      A.    Yes, sir.

15      Q.    When you say hired, what was

16  explained to you about Family Pediatrics

17  Home Care, if anything?

18      A.    It was limited.

19      Q.    To the best of your

20  recollection, what was -- what do you

21  recall?

22      A.    A pamphlet.

23      Q.    What?

24      A.    A pamphlet, a basic protocol.

25      Q.    When you say a pamphlet, you

1                    C. BOUTSIKAKIS

2  were given a pamphlet?

3        A.    I was not given.  I was -- I

4  received and they took back the pamphlet,

5  once we read it over.

6        Q.    Did they ever allow you to keep

7  it?

8        A.    I requested through

9  Mr. Kallecourt, a copy of protocol.  I

10 requested from Ms. Thompson, a copy of

11 protocol.

12              I was never given a copy of

13 said protocol.

14       Q.    If we refer to the same Exhibit

15 A, and I direct your attention to page 23

16 of 69, receipt for employee handbook,

17 kindly look at that writing.

18       A.    Yes, sir.

19       Q.    Is that your signature?

20       A.    Yes, sir.

21       Q.    Does it say that you received

22 it?

23       A.    Yes, sir, I did receive it.  I

24 was not allowed to bring that home.

25       Q.    Who told you, that you couldn't

1          C. BOUTSIKAKIS

2    take it home?

3          A.    The day of my interview I was

4    interviewed, I went through education and

5    hiring.

6               They did not have a copy for

7    me.  I was supposed to receive said copy

8    and as I previously stated, I asked both

9    Ms. Thompson and Mr. Kallecourt for

10   protocol and the handbook and I never

11   received it.

12         Q.    When you asked for it, was it

13   at the interview or subsequent to the

14   interview?

15         A.    At the interview, as well as

16   after.

17         Q.    Did you read the handbook,

18   while you were at the interview?

19         A.    You could not get through the

20   handbook.

21         Q.    Your statement that you signed

22   for it, you had it in your hand and then

23   you asked to return it?

24               Is that your statement?

25         A.    My statement is I received the

                    C. BOUTSIKAKIS

1

2    handbook.  We briefly reviewed it.  It was

3    taken back from me.

4              I asked for a copy.  I was told

5    I would receive one.  I never did.

6              MR. FRIEDBERG:  I'm going to

7         ask that the employee handbook be

8         marked as exhibit B, and it bears

9         your own filing.

10             MS. DODSON:  For the record

11        document 10915, our Bates stamp 175

12        through 198.

13             (Whereupon, the aforementioned

14        document was marked as Defendant(s)'

15        Exhibit B for identification as of

16        this date.)

17        Q.    If you look at that writing

18   that's before you --

19        A.    Yes, sir.

20        Q.    -- is that a copy of what was

21   given to you, at the interview?

22             MR. ANDERSON:  Object to form.

23        A.    Not the exact way that it

24   was -- I don't remember this particular.

25             I believe this is just a copy

1                    C. BOUTSIKAKIS
2  of it.  This wasn't the original, from what
3  I had seen.
4        Q.    I'm not saying original, but is
5  it a copy of the document that you actually
6  received at the interview?
7        A.    I would have to review it.
8        Q.    Well, take your time.
9        A.    Okay.
10       A.    Though it was printed in
11  2017 --
12       Q.    Does it say --
13       A.    -- the file date is 2015.
14             These are legal documents, so I
15  cannot confirm or deny.
16       Q.    Let me explain what you're
17  looking at.
18       A.    (Handing).
19       Q.    As of 2017, the dates that were
20  filed, I believe, in court by your counsel.
21       A.    I understand that.
22       Q.    But I'm showing you the
23  document itself and asking you if this --
24  if your recollection is refreshed, by
25  looking at the document?

                    C. BOUTSIKAKIS

1

2       A.      To a certain extent, yes.

3       Q.      Take your time.

4       A.      As I have stated previously, I

5    was not given the opportunity to go through

6    the employee handbook personally and

7    thoroughly.

8            So therefore I cannot give you

9    that statement of a yes or no, based on the

10   fact that I --

11      Q.      Did you ever make a demand of

12   that document, in writing?

13      A.      Yes, sir.

14      Q.      And was it in writing?   Was it

15   an email or a letter?

16      A.      Yes, sir, in an email to

17   Mr. Kallecourt.

18      Q.      But you're saying that you

19   actually demanded a copy or requested a

20   copy, sometime subsequent to the date of

21   your interview and you did it how?

22      A.      By email and also on the phone

23   through the corporation.

24           I do not recollect who I

25   contacted exactly and at that time when I

                    C. BOUTSIKAKIS

1
2   was trying to get, obtain a copy of the
3   employee handbook, I don't know who exactly
4   at first I was trying.
5           I know that I contacted the
6   company, my supervisor, Ms. Thompson.
7       Q.    Ms. Thompson, okay.
8           How did you contact her?   How
9   did you contact her?
10      A.    My first meeting with my
11  supervisor, was at the home of our client,
12  which is what we call our patient, and I
13  asked for the employee handbook that day.
14      Q.    And --
15      A.    I requested again to her
16  another copy, again of -- not another copy.
17  I requested same said copy repetitively
18  both through text message, by phone and in
19  person.
20      Q.    Did you ever send an email?
21          MR. ANDERSON:  Object to form.
22      A.    To Ms. Thompson, I don't
23  recall.
24      Q.    Did you send an email to
25  Mr. Kallecourt?

1                    C. BOUTSIKAKIS
2        A.     Yes, I did.
3        Q.     I wanted to refer you to, if
4    you look at that writing before you.
5        A.     Yes, sir.
6        Q.     And if you turn to page 12 of
7    24.
8        A.     Yes, sir.
9        Q.     It refers to compensation and
10   benefits.  That's the title, compensation
11   and benefits.
12       A.     My page 12 states criminal
13   background screening, in-service
14   education --
15       Q.     Page 12.
16       A.     I'm reading the bottom.  I'm
17   sorry.
18       Q.     That's all right.  Don't worry.
19              So the bottom would be 9, page
20   9.
21       A.     Okay.  I apologize.
22              What am I looking for, sir?
23       Q.     Did you read it?
24              Did you read that portion, at
25   the time that you were interviewed?

1                    C. BOUTSIKAKIS

2          A.     No, sir.

3          Q.     Did you read that portion at

4     anytime, while you were employed by Family

5     Pediatric Home Care?

6          A.     No, sir.

7          Q.     Was it ever explained to you at

8     that initial meeting, when you were hired

9     or anytime, the procedure that compensation

10    depended on your submitting nurse's notes?

11               Read it carefully.  Take your

12    time.  Take your time, please.

13         A.     I understand you stating, to

14    take my time.

15               However, we did not take our

16    time in my interview process.  So therefore

17    for me to --

18         Q.     At --

19               MR. ANDERSON:  Let the witness

20      finish answering the question,

21      please.

22         A.     -- for me to go through the

23    compensation section of this employee

24    handbook, after the fact, is irrelevant, I

25    feel.

1                    C. BOUTSIKAKIS

2        Q.    Well, was it ever explained to

3    you, that you would be paid, only after you

4    submitted nurse's notes?

5                MR. ANDERSON:  Object to form.

6        A.    I knew that I had -- I knew

7    that I needed to submit my nurse's notes,

8    in order to be paid.

9                That's the extent of my

10   knowledge of the compensation.  So

11   therefore I didn't know times.  This

12   mentions dates, times.

13               All I know is I call in, when I

14   come in.  I call out, when I leave and I

15   send in my notes.

16               That's the extent of what I was

17   told to do, when I --

18       Q.    And that you would be paid,

19   after the notes were received?

20       A.    Yes, sir.

21       Q.    When did you learn of that

22   procedure?

23               MR. ANDERSON:  Objection to

24       form.

25       A.    Unfortunately I was made aware

1                    C. BOUTSIKAKIS
2    of my compensation, as I went.  It was very
3    brief during the educational process, on
4    the date of hire.
5              Therefore I don't know -- we
6    never went through the entire -- I mean
7    there are several paragraphs.  We never
8    went -- it was a short sentence, compared
9    to several paragraphs.  So...
10        Q.    Do you know of that procedure,
11   on the day that you began actually caring
12   for the patient?
13        A.    Did I know that I was supposed
14   to hand my notes in?
15              Is this the question you're
16   asking?
17        Q.    Yes.
18        A.    Of course, yes.
19        Q.    And that you would be paid,
20   after your notes were handed in?
21        A.    Yes, sir.
22              MR. ANDERSON:  Object to form.
23        Q.    Thank you.
24              Look at the last page of that
25   writing that you have, page 24 of 24.

C. BOUTSIKAKIS

1

2      A.    Yes, sir.

3      Q.    And it's entitled clinical

4   records.

5      A.    Yes, sir.

6      Q.    And were you aware of the

7   requirement that records of the patient's

8   care shall be maintained, within the

9   patient's home?

10     A.    Yes, sir.

11           MR. ANDERSON:  Object to form.

12     Q.    That's what I read from the

13   document itself.

14           Are you aware of that

15   requirement?

16           MR. ANDERSON:  Object to form.

17     A.    Yes, sir.

18     Q.    Looking at that page, clinical

19   record, is there anything that you were not

20   aware of, when you first began treating a

21   patient?

22           MR. ANDERSON:  Object to form.

23     A.    Can you please repeat?   I'm

24   sorry.

25     Q.    Looking at that page listing

                    C. BOUTSIKAKIS

1

2    the documentation required, was there

3    anything there that you were not aware of,

4    when you first began treating the patient?

5         A.    No.

6         Q.    Now, was it explained to you,

7    when you were first hired, how you would

8    record your time, in the care and treatment

9    of a patient?

10              MR. ANDERSON:  Object to form.

11        A.    Yes.

12        Q.    And what was explained to you?

13        A.    I was to call from the

14   patient's home, from their, from their

15   home, not from my personal cell phone or --

16   that was not allowed.

17              It had to be the patient's

18   home, whether it be their home telephone or

19   their -- the patient's mother's cell phone,

20   I needed to record the time by that.

21              So I clocked in, by calling the

22   number.  I clocked out, by calling the

23   number as well.

24        Q.    Now, did you also record your

25   time on your nurse's notes, when you came

1                C. BOUTSIKAKIS

2    in and when you left?

3         A.    Yes, sir.

4              MR. ANDERSON:  Object to form.

5         Q.    Was there any difference in the

6    time when you clocked in and clocked out

7    and when you entered the time of treatment

8    and the time you left?

9              Was there any difference in the

10   time?

11             MR. ANDERSON:  Object to form.

12        A.    Yes, sir.

13        Q.    What was the difference?

14        A.    If I come in to treat a

15   patient, my main objective is to treat a

16   patient.

17             My oath as a nurse is to put

18   the patient first and I always did.

19             So, therefore, if a patient

20   needed service, I came in.  I completed

21   said service and if I needed to clock in

22   later, I would explain to my supervisor or

23   try to, and I would note on my own

24   documents the exact time I was there and I

25   don't know what -- you know, sometimes it

1                    C. BOUTSIKAKIS
2    didn't always correlate.
3              If I came into a home, I know
4    I'm supposed to -- this was the problem.  I
5    was coming into the patient's home and I
6    know I needed to call, but I know when I
7    got there, there may have been a lapse in
8    time.  I was always there early.
9              I always performed my duties
10   and I know the first thing to do was to
11   call.
12             However, if I needed to do
13   something and a patient was in distress,
14   that was my main concern.
15        Q.   So on the nurse's notes it
16   states the time began, would that be
17   entered immediately upon your treatment of
18   the patient?
19             MR. ANDERSON:  Object to form.
20        A.   I recall carrying my own
21   booklet and writing down a time, as I
22   entered the house, and that's how I would
23   begin with my notation, when I was able to.
24             So I would come into a home.
25   If I was able to call in first, that's

```
1                    C. BOUTSIKAKIS
2    exactly what I would do.
3               If the child needed service, as
4    soon as I entered the home, straightaway I
5    would perform my nursing duties.
6         Q.    What about the time that you
7    indicated on your nurse's notes, when you
8    did enter that time, as to when you started
9    and when you ended?
10              MR. ANDERSON:   Object to form.
11        A.    I jotted down just when I
12   parked my car.
13              I would write down the exact
14   time that I was entering the home and then
15   I would start my notes, as soon as I was
16   able to.
17        Q.    So I understand the notes
18   reflected, when you first parked your car?
19        A.    No.
20              I'm saying I park my car.  I
21   was able to get out of the car and as I
22   walked into the house, that was the first
23   thing I wrote down.
24              I looked at my watch.  I always
25   had a watch and I wrote down the time that
```

```
 1                C. BOUTSIKAKIS
 2    I walked into that home.
 3         Q.    When did you start your
 4    treatment?
 5               When did you indicate, when did
 6    you indicate the time that you started the
 7    treatment of the patient?
 8               MR. ANDERSON:  Object to form.
 9         A.    It varied.
10         Q.    Varied, as to what?
11         A.    As to the patient's needs.
12         Q.    In this case you were dealing
13    with a patient; is that correct?
14         A.    Yes, sir.
15         Q.    And, by the way, that patient
16    is, am I correct, the first patient you
17    ever had as a registered nurse?
18         A.    Yes, sir.
19         Q.    And so we're dealing with a
20    patient and when -- the question is with
21    this patient that you were assigned to,
22    when did you enter the time that you began
23    treatment?
24               MR. ANDERSON:  Object to form.
25         A.    I'm not understanding this
```

1                    C. BOUTSIKAKIS
2    question.
3         Q.    Is there a place on the nurse's
4    notes, for start time and end time?
5              MR. ANDERSON:  Object to form.
6         A.    I believe so, yes.
7         Q.    So when did you put the start
8    time?
9              MR. ANDERSON:  Object to form.
10        A.    When I performed my duty, not
11   when I walked into the house.
12        Q.    Now, did you clock in, before
13   you performed your duties?
14             MR. ANDERSON:  Object to form.
15        A.    That question is irrelevant.
16             I don't see the relevance in --
17        Q.    Relevant or not, it's for
18   somebody else to determine.
19        A.    I don't understand the
20   question.  I'm sorry.
21        Q.    When did you clock in --
22             MR. ANDERSON:  Object to form.
23        Q.    -- physically?
24             MR. ANDERSON:  Object to form.
25        Q.    With respect to this particular

                    C. BOUTSIKAKIS

1    patient, what was your practice?

2        A.    My practice was I had a

3    patient, that I would come into the home.

4    The patient was still connected to

5    dialysis, that I had hooked up from the

6    night before.

7            So if I had to come in and the

8    patient, which was, she was a baby and if

9    the child needed my attention very quickly,

10   because she was awake, I was not picking up

11   a phone and dialing a number and then going

12   to see her.

13           I was straightaway going to

14   that patient and performing my duty, with

15   protocol.

16       Q.    When you started performing

17   your duties, did you indicate on your

18   nurse's notes, when you started to perform

19   those duties?

20           MR. ANDERSON:  Object to form.

21       A.    Yes.

22       Q.    And what record did you have,

23   to indicate the start time?

24           MR. ANDERSON:  Object to form.

```
 1              C. BOUTSIKAKIS
 2       A.    My nurse's documentation.
 3       Q.    So was that entered as you were
 4  performing your duties, in the care of that
 5  patient?
 6       A.    Can you repeat the question?
 7       Q.    When you entered the time you
 8  started treatment on the nurse's notes,
 9  when did you enter that time?
10            MR. ANDERSON:  Object to form.
11       A.    I entered the time, when I
12  performed my duty.  I'm not exactly sure.
13  I don't understand the question.  I'm
14  sorry, sir.
15       Q.    Did you make a note, of the
16  time that you started performing your
17  duties?
18       A.    Yes, sir.
19       Q.    And how did you make a note --
20            MR. ANDERSON:  Object to form.
21       Q.    -- physically?
22       A.    I jotted it down.
23       Q.    And then when you prepared your
24  notes, was it based on the notes that you
25  had jotted down?
```

                        C. BOUTSIKAKIS

 1

 2      A.      Of course.

 3      Q.      And was that time different,

 4  from the time that you actually called in

 5  and clocked in or out to your employer?

 6              MR. ANDERSON:  Object to form.

 7      A.      Sometimes yes.

 8      Q.      And what was the reason for

 9  that?

10      A.      As I previously stated, if a

11  patient was in -- needed emergent care, my

12  professional duty was to that patient.

13              I took an oath.  I swore an

14  oath and I needed to abide by that.

15              A baby in distress is much more

16  important than a phone call and I will

17  stand by that.

18      Q.      And is it correct that the time

19  that you began treating the patient, is

20  based upon actual time that you entered

21  into your notebook?

22              MR. ANDERSON:  Object to form.

23      A.      My time of treatment, was what

24  I documented in my notation.

25              The phone call may have been

```
 1                    C. BOUTSIKAKIS
 2   within a different time span.
 3                 If it was extreme, I would
 4   inform my supervisor.
 5                 Other than that, I don't know
 6   how else to answer this question.
 7        Q.     When you say extreme, how do
 8   you, how do you interpret the word extreme?
 9        A.     Extreme is I have a newborn,
10   actually a 17 month old on dialysis.
11                 Coming into a home with a 17
12   month old on dialysis treatment, if that
13   child was awake, my first duty was to go to
14   her and make sure she was okay, safe and
15   all sterile technique was taken care of.
16   Picking up a phone, as opposed to
17   sterilizing and treating the patient, I
18   mean these are two different things.
19                 When I had asked my supervisor
20   of that lapse, I got no response.
21        Q.     Who was your supervisor?
22        A.     Ms. Thompson.
23        Q.     Do you know her first name?
24        A.     I do not.  I do not recall.
25                 I was very professional.  I
```

1                    C. BOUTSIKAKIS
2    only knew Mr. Kallecourt, because it was in
3    his email.  I never met him personally.
4         Q.    And is it fair to say that the
5    entry of the time that you started
6    treatment, is more accurate than that of
7    clocking in and clocking out?
8                   MR. ANDERSON:  Object to form.
9         A.    Are you asking me if my
10   notation, is more accurate than the calls?
11        Q.    Yes.
12        A.    Yes, of course.
13        Q.    The first day was June 8th,
14   2015.
15                   That was the day that you were
16   interviewed.  Is that correct, based on --
17        A.    Yes, sir.
18        Q.    And you were on that date, your
19   statement, you were assigned to Family
20   Pediatric Home Care?
21        A.    Yes, sir.
22                   MR. ANDERSON:  Object to form.
23        Q.    Was it explained to you what
24   was the nature of Family -- what was the
25   activities of Family Pediatric Home Care,

```
 1                  C. BOUTSIKAKIS
 2   which would be asked of you as a registered
 3   nurse?
 4              MR. ANDERSON:  Object to form.
 5       A.    What was asked of me, was very
 6   broad.
 7              So for me to respond to that
 8   question, I can't give you specifics.  I'm
 9   sorry.
10       Q.    Did anyone explain to you, that
11   you would be a private duty home care
12   nurse?
13              MR. ANDERSON:  Object to form.
14       A.    I was told I would be a private
15   duty registered nurse.
16       Q.    What is a private duty
17   registered nurse?
18       A.    A registered nurse, as opposed
19   to a home health aide, is able to perform
20   duties on a higher level, such as what I
21   did, which was dialysis treatment, wound
22   care, medication administration.
23              Those are the things that
24   registered nurses do.
25       Q.    But --
```